## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

IN THE MATTER OF THE SEARCH OF
THE PROPERTY LOCATED AT 373
MEADE AVE, ROOM 227B, KITTERY,
MAINE

IN THE MATTER OF THE SEARCH OF
THE SILVER 2010 FORD FOCUS
BEARING TEXAS REGISTRATION
PVX2120

IN THE MATTER OF THE SEARCH OF
THE WHITE 2011 MERCEDES-BENZ ML
350 BEARING TEXAS REGISTRATION
VBZ1663

IN THE MATTER OF THE SEARCH OF
THE PERSON OF KENNETH KRING

Case No. 2:25-mj-00011-KFW

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Anthony Golt, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Supervisory Special Agent ("SSA") with the Naval Criminal Investigative Service ("NCIS") and am currently assigned to the Portsmouth Naval Shipyard in Kittery, Maine. I have been the SSA for the Portsmouth office since January 2024. Prior to my current assignment, I was a Special Agent in New Jersey and was the Special Agent assigned to the USS Essex during their 2020-2021 deployment. I completed initial Special Agent training at the Federal Law Enforcement Training Center in 2018. I am a Certified Fraud Examiner and I hold a Bachelor's of Science Degree in Business from Montana State University. I have received training in the area of child pornography and child exploitation and have had the opportunity to observe

and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. I have led and assisted on multiple investigations involving the viewing and distribution of child pornography, which have been prosecuted in Federal and Military courts.

2.     Moreover, I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). As a federal law enforcement officer, I am authorized by law to obtain and execute search warrants issued under the authority of the United States.

3.     This application seeks authority to search for and seize evidence, fruits, and instrumentalities related to the following federal crimes: 18 U.S.C. §§ 2252A(a)(5)(B) & (b)(2) (possession of child pornography) and 2252A(a)(2)(A) and (b)(1) (distribution of child pornography).

4.     I make this affidavit under Rule 41 of the Federal Rules of Criminal Procedure in support of a search warrant for the following premises/individuals, including the content of electronic storage devices located therein:

- The premises of 373 Meade Ave, Room 227B, in Kittery, Maine (the "SUBJECT PREMISES"), further described in Attachment A;

- A silver 2010 Ford Focus bearing Texas registration PVX2120, which is registered to Kenneth KRING, further described in Attachment A;

- A white 2011 Mercedez-Benz ML 350 bearing Texas registration VBZ1663, which is registered to Kenneth KRING, further described in Attachment A; and

- The person of Kenneth KRING (DOB 03/11/2003)

2

to search for and seize any evidence, fruits and instrumentalities of the above-listed federal crimes, further described in Attachment B.

5.    As a result of the investigation described more fully below, there is probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(5)(B) & (b)(2) (possession of child pornography) and 2252A(a)(2)(A) and (b)(1) (distribution of child pornography) (the "TARGET OFFENSES") are located within the SUBJECT PREMISES, the silver 2010 Ford Focus, the 2011 Mercedes-Benz ML 350, or on Kenneth KRING's person. I submit this application and affidavit in support of a search warrant authorizing a search of these locations, as further described in Attachment A, incorporated herein by reference, and to seize evidence, fruits, and instrumentalities of the foregoing criminal violations, as more fully described in Attachment B, also incorporated herein by reference.

6.    The statements contained in this affidavit are based in part on information provided by U.S. federal law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by law enforcement agents/analysts and computer forensic professionals; and my experience, training and background as a Special Agent.

7.    This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant. I have therefore set forth the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations or attempted violations of the TARGET OFFENSES are presently located in the places to be searched.

## STATUTORY AUTHORITY

8.     As noted above, this investigation concerns alleged violations of the following:

a.     18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

b.     18 U.S.C. § 2252A(a)(2)(A) and (b)(1) prohibit a person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

9.     The following definitions apply to this Affidavit and Attachment B:

a.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

4

b.    "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct or the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. Child pornography is also referred to as "child sexual abuse material" or "CSAM."

c.    "The Cloud" and "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

d.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices.  *See* 18 U.S.C. § 1030(e)(1).

e.    "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks,

external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

      f.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

      g.    "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

      h.    The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and

international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

j.      An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

k.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

l.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

m.      "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

n.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

o.      A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

p.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND OF THE INVESTIGATION
## AND SHOWING OF PROBABLE CAUSE

10.     In early December 2024, NCIS was notified by the North Texas Internet Crimes Against Children ("ICAC") Task Force that a United States Navy Sailor assigned to Portsmouth Naval Shipyard in Kittery, Maine may be involved in the possession and/or viewing of CSAM. The North Texas ICAC Task Force learned of this information

from 24 National Center for Missing & Exploited Children ("NCMEC")[1] CyberTip reports, all of which stated that the user of cell phone number (830)285-0601 possessed, manufactured, and/or distributed apparent child pornography. Each of the 24 CyberTip reports were submitted by Synchronoss Technologies, Inc. ("Synchronoss"), the cloud-based storage provider for content stored on the Verizon Cloud. Together, the CyberTip reports identified CSAM activity involving this phone number between January 30, 2024 and November 30, 2024.

11.     The NCMEC reports identified the (830)285-0601 phone number as associated with E.B.[2] of Dallas, Texas. However, as described below, further investigation has determined that this phone number is associated with Kenneth KRING ("KRING"), a sailor assigned to the USS CHEYENNE, which is currently stationed at Portsmouth Naval Shipyard in Kittery, Maine.[3] Accordingly, as further explained below, I believe that the references in the CyberTip reports to E.B. is incorrect.

12.     I have reviewed the underlying files associated with the CyberTip reports.[4] The CyberTip reports identify a total of 67 video files containing CSAM, most of which

---

[1] NCMEC is a private, non-profit 501(c)(3) organization that serves as a national clearing house and resource center for families, victims, private organizations, law enforcement, and the public on missing and sexually exploited child issues. In connection with this mission, NCMEC operates the CyberTipline. The CyberTipline receives reports, including reports from electronic service providers, of apparent child pornography production, trafficking, and possession.

[2] The name of this individual is known to me.

[3] As described further below, a subpoena to Verizon Wireless indicated that the subscriber of this phone number is "Kenneth L Kring". In addition, the (830)285-0601 phone number is found in Department of Defense ("DoD") records as belonging to "Kenneth Lee Kring". Finally, from my involvement in the investigation, I know that KRING also provided this phone number when he checked into his barracks room on November 16, 2023.

[4] Synchronoss identified the images as child pornography through the images' hash values (also known as the MD5 hash value). They then reviewed the images and confirmed the presence of CSAM, after which they quarantined the files containing CSAM and submitted the CyberTip reports. Hash values are non-pictorial, alphanumeric values assigned to pieces of data such as

depict sexually explicit conduct involving prepubescent females. The videos also depict sexually explicit conduct involving infants and toddlers, and bestiality involving children. Listed below are examples of the CSAM files identified in the Synchronoss CyberTip reports as associated with phone number (830)285-0601:

Example 1 (from CyberTip report 199366371)[5]:

**Filename:** 0448c4caebc242c39cc353a2a064fd76_6433ee0b8c00db724907354fe27d74eb19 06b1863876f3db9d67c495af7502d6

**Hash value:** 0636454342d0ee9265f0c0cb4e9a06a6

**Date/time:** The file was uploaded on 9/20/2024 at 10:32:46 UTC.

**Description:** This is a video one minute and fifty-two seconds in length depicting an adolescent female, approximately 16-19 years old, in the top frame with the caption "Omegle.com", and an approximately four-year-old minor female with an adult male in the lower frame. The adolescent in the top frame appears to be communicating with another party off-camera, and she states that the child in the lower frame is twelve years old.[6] The minor female in the lower frame is penetrated in the vagina and anus by the adult male's penis, and is penetrated in the vagina with the male's fingers. Toward the end of the video, the adolescent female removes her clothing and exposes her breasts.

A screenshot of this video has been submitted under seal as **Exhibit A**.

---

images and videos. Hash values are unique and can therefore serve as the "fingerprint" of a file for matching purposes; in addition, the original image cannot be recreated from the hash value itself. Because a hash value is a unique digital fingerprint assigned to an image or video, different versions of the same file will have a matching hash value. As background, when NCMEC receives a report of child pornography from a technology company, NCMEC analysts review the files at issue, label them with key information such as the type of content and the estimated age range of the individual portrayed, and track the hash values of the files. Once a particular hash value has been confirmed as child pornography and has been reviewed, labeled, and logged three times, NCMEC adds the hash value to a list that is shared with technology companies, such as Synchronoss. Those technology companies can then elect to use NCMEC's hash list to detect child pornography on their systems so the abusive content can be reported and removed. Synchronoss identified the apparent child pornography reported in the CyberTip reports described above through NCMEC's hash value list.

[5] This CyberTip report was submitted on September 22, 2024.

[6] This statement is clearly incorrect. Based on my training and experience it is obvious from viewing the minor female that she is a toddler.

Example 2 (from CyberTip report 200398495)[7]:

**Filename:** 0448c4caebc242c39cc353a2a064fd76_44402e1832a0314b73bd62cc54a139bd83 8da9bd15567d73b029093edee4dda7

**Hash value:** 14d547ac8014841fa5c31b387767785f

**Date/time:** The file was uploaded on 10/12/2024 at 23:31:46 UTC.

**Description:** This is a video one minute and fifty-five seconds in length depicting a naked pre-pubescent female, approximately six years old, with an adult female and an adult male. The minor female digitally penetrates the adult female's vagina and performs oral sex on the adult female. The minor female then lies on her back, next to an adult male who is completely naked. The male touches the child's vagina and breasts. The top-right corner of the frame has the following text printed in red: "telegram: @cp833".

A screenshot of this video has been submitted under seal as **Exhibit B**.

Example 3 (from CyberTip report 202119293)[8]:

**Filename:** 0448c4caebc242c39cc353a2a064fd76_6046a71893e0d436b2af2e9eb36c3500f2 2a6a43a9b0d7153c442eb2e19581e1

**Hash value:** 0c85ba65ae51fc353c4fbac4c25da227

**Date/time:** The file was uploaded on 11/5/2024 at 21:28:36 UTC.

**Description:** This is a video one minute and forty-nine seconds in length portraying a pre-pubescent female, approximately ten years old, with her breasts, vagina, and buttocks exposed. A black and white dog appears as the minor female places herself in an exposed position to allow the dog to mount and engage in what appears to be sexual intercourse with the child. The top-right corner of the frame has the following text written in white ink "LiveMe 226171431".

Example 4 (also from CyberTip report 202119293)

**Filename:**

---

[7] This CyberTip report was submitted on October 15, 2024.

[8] This CyberTip report was submitted on November 8, 2024.

0448c4caebc242c39cc353a2a064fd76_6046a71893e0d436b2af2e9eb36c3500f2 2a6a43a9b0d7153c442eb2e19581e1

**Hash value:** 0c85ba65ae51fc353c4fbac4c25da227

**Date/time:** The file was uploaded on 11/5/2024 at 21:27:14 UTC.

**Description:** This is a video forty-eight seconds in length portraying a pre-pubescent female, approximately ten years old, with her breasts, vagina, and buttocks exposed. She is wearing what appears to be a collar around her neck with a silver, metal buckle, and she is positioned underneath a white animal, possibly a dog. The minor female is holding the animal's penis and places it into her mouth, performing oral sex on the animal. Another individual's hand briefly appears in the video and assists the child with handling the animal's penis.

13. The 24 CyberTip reports identified a total of three IP addresses associated with the file uploads:

    a. 96.78.208.117 (used from 3/7/2024 at 13:22 UTC to 3/17/2024 at 18:32 UTC)

    b. 70.168.213.227 (used from 3/21/2024 at 17:59 UTC to 3/21/2024 at 18:04 UTC)

    c. 71.233.80.68 (used from 7/30/2024 at 23:17 UTC to 11/30/2024 at 15:28 UTC)[9]

14. Open-source queries indicated that the first and third IP addresses listed above (96.78.208.117 and 71.233.80.68) belong to Comcast Cable Communications ("Comcast"). On December 13, 2024, law enforcement sent a subpoena to Comcast. Comcast responded on December 16, 2024, indicating that IP address 71.233.80.68 is assigned to Viasat, Inc. ("Viasat"). Based on my involvement in this investigation, I know that Viasat is the internet provider for the barracks building that KRING resides

---

[9] The CyberTip reports identify this IP address as the one that was used to uploaded CSAM Examples 1-4 described above.

in.[10] Law enforcement sent a subpoena to Viasat on December 18, 2024. At this time, a response has not been received.

15.     Open-source queries indicated that the second IP address listed above (70.168.213.227) belongs to Cox Communications, Inc. ("Cox"). On December 13, 2024, law enforcement sent a subpoena to Cox. At this time, a response has not been received.

16.     On November 14, 2024, the North Texas ICAC Task Force served an administrative subpoena on Verizon Wireless ("Verizon") for subscriber information associated with the (830)285-0601 phone number. Verizon's response stated that the subscriber of this phone number is "Kenneth L Kring". In addition, I know from my involvement in this investigation that this (830)285-0601 phone number is found in DoD records as belonging to KRING, and that KRING provided this (830)285-0601 phone number to NGIS when he checked into his barracks room on November 16, 2023.

17.     As stated above, based on this information, I believe that the NCMEC reference to the (830)285-0601 phone number belonging to E.B. of Dallas, Texas is incorrect. In my training and experience, I know that NCMEC uses TLOxp, a database used by law enforcement, to associate phone numbers with account holders. TLOxp pulls a significant amount of its information from credit or banking applications. I ran the (830)285-0601 phone number through the TLOxp database on January 2, 2025, and saw that it listed E.B. as the possible subscriber of the phone number. However,

---

[10] On December 12, 2024, I spoke with the manager of the Navy Gateway Inn & Suites ("NGIS"), the entity that manages the barracks buildings aboard the Portsmouth Naval Shipyard. He informed me that NGIS provides publicly available wireless internet within the barracks buildings, and that Viasat is the company that provides this service. In addition, while doing surveillance of KRING's barracks, I connected my NCIS-issued iPhone to the publicly available wi-fi network. Once connected, I observed that the IP address assigned to me was 71.233.80.68, which is one of the IP addresses identified in the CyberTip reports (and the IP address used to upload CSAM Examples 1-4 described above).

TLOxp also indicated that this association was only 38% likely to be accurate. In my training and experience, E.B. was likely associated with the (830)285-0601 phone number at some point in the past. Given that this investigation has determined that KRING is the current subscriber of this phone number, it is likely that KRING has not used this phone number on any credit or banking applications, and therefore TLOxp has not been updated to show that KRING is the person currently associated with the phone number.

18.    On November 19, 2024, the North Texas ICAC Task Force obtained a search warrant in Texas State Court for the contents of the Synchronoss Cloud account associated with phone number (830)285-0601 for the time-period October 12, 2023 through October 12, 2024 (the "Synchronoss Search Warrant"). Synchronoss provided the requested materials on November 22, 2024.

19.    I have reviewed the Synchronoss Search Warrant return. During my review, I identified several additional CSAM files. Specifically, I identified 11 video files and 2 image files containing CSAM in a folder labeled "2024-10-12". Some of these files appear to be duplicates of files previously reported to NCMEC by Synchronoss, including Examples 1 and 2 described above. Listed below are two examples of additional CSAM files identified in the Synchronoss Search Warrant return:

Example 5:

**Filename:** 5ea147d8-6aa5-45d5-bbb6-b39daffbace0.mp4

**Description:** This is a video one minute and two seconds in length portraying a pre-pubescent male, approximately ten years old, wearing a blue shirt and green shorts sitting in front of an adult male who has his erect penis exposed. The adult male forces the child to place the adult's penis into the child's mouth and to perform oral sex. The adult male is then observed masturbating and ejaculating into the child's mouth.

14

A screenshot of this video has been submitted under seal as **Exhibit C**.

Example 6:

**Filename:** 01b52707-671d-4b21-bfcf-c74b062af6ad.mp4

**Description:** This is a twenty-seven second video depicting two pre-pubescent females, approximately twelve years old, wearing blue shirts. Both of the minor females expose and manipulate their breasts for the camera. The minor female on the left of the frame is seen holding a purple vibrator and moves the vibrator around her left breast.

20.     On December 12, 2024, the manager of NGIS provided room registration records for KRING. These records indicate that KRING currently resides in Building 373 (also known as "Johnson Hall"), Room 227B (the "SUBJECT PREMISES"), and has resided there since November 16, 2023.

21.     From my involvement in this investigation, I know that KRING has two vehicles, both of which are registered to him, that are frequently parked in the parking lot outside of Johnson Hall. The manager of NGIS provided me with a parking permit form dated September 2, 2023, in which KRING identified a 2010 Ford Focus bearing Texas registration PVX2120 as belonging to him.[11] The manager of NGIS also provided me with a parking permit form dated May 10, 2024, in which KRING identified a 2011 Mercedes-Benz ML 350 bearing Texas registration VBZ1663 as belonging to him. In recent weeks, I have observed both of these vehicles parked in the parking lot outside Johnson Hall.

---

[11] KRING first checked into the barracks on this date. However, he was assigned to a different building and room from September 2, 2023 to November 16, 2023 (when he moved to the SUBJECT PREMISES).

## BACKGROUND ON CHILD PORNOGRAPHY, CHILD EXPLOITATION, COMPUTERS, AND THE INTERNET

22.     I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a.     Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b.     Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.     A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

16

d.      The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person.  Smartphones and/or mobile phones are also often carried on an individual's person.

e.      The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.      Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.      A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps."

17

Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

  h. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

  i. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer, smartphone, or other internet-capable device.

j.      Many of these devices, which may contain contraband, fruits and evidence of crime, are by their very nature portable, this includes as example, but is not limited to, compact storage devices such as smart phones, laptop computers, and tablets. In my training and experience, I know it is not uncommon for individuals to keep these devices on their person or in multiple locations within their premises, including in outbuildings and motor vehicles.

### CHARACTERISTICS COMMON TO INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN OR WHO PRODUCE, RECEIVE, AND/OR POSSESS CHILD PORNOGRAPHY

23.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce, advertise, transport, distribute, receive, possess, and/or access with intent to view child pornography (i.e., "consumers" of child pornography) and individuals who are developing inappropriate relationships with children online:

a.      Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.      Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.

Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.    Such individuals almost always possess and maintain child pornographic material in the privacy and security of their home, their vehicle, or some other secure location. Individuals who have a sexual interest in children or images of children typically retain those materials and child erotica for many years.

d.    Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e.    Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[12]

---

[12] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the

f.      Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g. online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child pornography.

g.      Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.      Even if the target uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the SUBJECT PREMISES, as set forth in Attachment A, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

24.    Based on all of the information contained herein, I believe that KRING, who resides at the SUBJECT PREMISES, likely displays characteristics common to individuals who access online child sexual abuse and exploitation material via a website. In particular, KRING possessed, manufactured, and distributed at least 67 files of child

---

behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

pornography on Synchronoss between January 30, 2024 and November 30, 2024, and possessed at least 13 additional files of child pornography in his Synchronoss account between October 13, 2023 and October 12, 2024.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

25.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PREMISES, in whatever form they are found. One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

26.     I submit that if a computer or storage medium is found in the SUBJECT PREMISES, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

a.     Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person

"deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

27.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word

23

processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the

24

computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, Internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I

believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

28.    Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.    Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search website all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to

recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

     c.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

     d.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

29.     Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

30.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC ACCESS TO DEVICES

31.     This warrant permits law enforcement to compel KRING to unlock any electronic devices requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through their face. For example, this

feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.      If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with their irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers their irises by holding the device in front of their face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal

31

activities and thus have a heightened concern about securing the contents of a device.

      f.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

      g.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.      Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of KRING to the fingerprint scanner of the devices found at the SUBJECT PREMISES; (2) hold the devices found at the SUBJECT PREMISES or on the person of KRING in front of the face of KRING and activate the facial recognition feature; and/or (3) hold the devices found at the SUBJECT PREMISES or on the person of KRING in front of the face of KRING and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that KRING to state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel KRING to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

32.      Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A, respectively.  I respectfully request that this Court issue a search warrant for the location described in

Attachment A, authorizing the seizure and search of the items described in Attachment B, respectively.

33.    I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab; digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

_____
Anthony Golt
Supervisory Special Agent
Naval Criminal Investigative Service

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date:    Jan 07 2025

City and state:    Portland, Maine

_____
Judge's signature

Karen Frink Wolf,  U.S. Magistrate Judge
Printed name and title

34